IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CT-3054-BO

**Jesse Lee Karrick**,

                Plaintiff,

v.

**Mr. Washington,** et al.,

                Defendants.

**Memorandum & Recommendation**

Both Plaintiff Jesse Lee Karrick and Defendants Applewhite, Rivers, Schankweiler, and Hunt request that the court enter summary judgment in their favor as to Karrick's excessive force claim. D.E. 44, 49. The parties' submissions establish that there are no genuine issues of material fact and that the Defendants' actions on May 14, 2015, did not violate the Eighth Amendment's prohibition on the use of excessive force. The Defendants' actions were constitutionally permissible in light of their perception that Karrick threatened to harm himself and his attempt to assault correctional officers. Therefore, the undersigned recommends that the District Court deny Plaintiff's Motion for Summary Judgment and grant the Defendants' Motion for Summary Judgment.

**I.    Procedural Background**

On March 3, 2015, Karrick, proceeding *pro se*, filed an unverified Complaint against several employees of the Warren Correctional Institution ("Warren C.I."), alleging the use of excessive force in violation of the Eighth Amendment. D.E. 1. Karrick named Deputy Warden

Washington and Warren Correctional Officers Applewhite, Rivers, Schankweiler,[1] and Hunt as defendants. On the same day, Karrick filed a motion seeking appointed counsel. D.E. 3.

After conducting a preliminary review pursuant to 28 U.S.C. § 1915A, the court allowed Karrick's individual capacity claims against Defendants Applewhite, Rivers, Schankweiler, and Hunt to proceed; denied Karrick's motion to appoint counsel; dismissed the claims against Washington in their entirety; and dismissed the claims against the defendants in their official capacities. D.E. 13, 14. The remaining Defendants filed an answer that denied the material allegations in the Complaint and raised a number of affirmative defenses. D.E. 27. After conducting discovery, both parties filed motions seeking summary judgment in their favor. D.E. 44, 49. Karrick's motion is neither verified, nor accompanied by supporting affidavits. Neither party responded to the opposing party's summary judgment motion.

After considering the parties' arguments and the relevant law, Karrick has not demonstrated that he is entitled to the relief he seeks and the undersigned recommends that his motion for summary judgment be denied. On the other hand, the Defendants have shown that they are entitled to summary judgment on Karrick's claim against them and the undersigned recommends that the district court enter a judgment in their favor.

## II. Factual Background

On May 14, 2014, at approximately 12:00 Noon, Correctional Officer Dionne Garrett was working in her office when Karrick arrived to complete some paperwork. Garrett Aff. ¶ 4, D.E. 52–5. After he arrived, Karrick became loud and argumentative about his work assignment in the kitchen. *Id.* He ignored orders from Garrett and Correctional Officer Sandra Smith to be

---

[1] The complaint misspells Correctional Officer Schankweiler's last name as "Shannweiler." *Compare* Compl., D.E. 1 *with* Shankweiler Aff., D.E. 52-6. The clerk is directed to correct the record to reflect the proper spelling.

quiet. *Id.* Karrick continued to be argumentative, but eventually left Garrett's office. *Id.* Fifteen minutes later, Karrick returned, threw his hands in the air, and screamed out "Mrs. Smith, I'll be back to talk to you after her ass is gone." *Id.*

Due to his disruptive behavior, an unspecified staff member handcuffed Karrick and began to escort him to the restrictive housing unit. *Id.; see also* Rivers's Resp. to Req. for Admis. ¶ 7, D.E. 44–1 at 66. The restrictive housing unit is designated for those inmates deemed to be repeatedly disruptive of the orderly operations of the facility, are threats to the safety of staff or other inmates, or who threaten the security or operational integrity of the facility. Applewhite Aff. ¶ 9, D.E. 57–1. Prior to this incident, Karrick had been found guilty of numerous facility infractions, including two instances of threatening to harm/injure staff and nine instances of refusing to obey an order. *Id.* ¶ 8.

A few minutes later, Schankweiler saw Karrick struggling to pull away from Correctional Officer Patton's grip. Schankweiler Aff. ¶ 5, D.E. 52–6. Schankweiler assisted Patton in securing Karrick by grasping Karrick's upper left arm. Karrick yelled, "The kitchen trapped me! That dumb bitch. Now I know how they do new workers. Fuck this place!" *See* Schankweiler Aff. ¶ 5, D.E. 52–6. Karrick stated, "I get out in a year and my apartment is going to be paid for. The state is gonna pay for my apartment." *Id.* ¶ 6. Schankweiler gave Karrick a direct order to state his name, but Karrick refused to answer. *Id.* ¶ 7. As Patton and Schankweiler attempted to escort Karrick to restrictive housing, Karrick continued to struggle and pull away from them, ignoring several orders to stop resisting, and instead pulling and twisting in attempt to escape. *Id.* ¶ 6; Rivers Aff. ¶ 5, D.E. 52–5. Rivers observed that Schankweiler and Patton were having difficulty controlling Karrick and went to assist them. *Id.* Karrick refused several direct orders to stop

3

resisting and to calm down. Rivers asked Karrick his name, and Karrick responded, "Fuck you." *Id.*

Officers were eventually able to escort Karrick to a holding cell where he would remain until he was assigned a cell in the restrictive housing area. Schankweiler Aff. ¶ 7; Rivers Aff. ¶ 6. As they entered the holding cell, Schankweiler took control of Karrick's left upper arm. Rivers Aff. ¶ 6. At the same time, Rivers took control of Karrick by the handcuffs with his left hand and placed his right hand on the back of Karrick's right shoulder. *Id.* Despite Karrick's resistance, the officers moved him to the back wall of the holding cell. Rivers Aff. ¶ 6. Rivers and Schankweiler ordered Karrick to stop resisting and to remain facing the wall several times. *Id.* Karrick refused to obey the orders and, instead, walked in an aggressive manner toward Schankweiler and Rivers as they were exiting the cell. *Id.*; Schankweiler Aff. ¶ 7. Karrick told Rivers, "old man, you can't do nothing with this." Rivers Aff. ¶ 7.

Shortly thereafter, Sergeant Applewhite joined Hunt, Schankweiler, and Rivers outside of the holding cell. Applewhite Aff. ¶ 9. The officers informed the Sergeant that that they were attempting to escort Karrick to a restrictive housing cell, but he was refusing to cooperate. *Id.* Applewhite entered the holding cell and ordered Karrick to accompany him to cell # 149 in the restrictive housing section. Karrick obeyed the order. Applewhite and the correctional officers escorted him to a cell in the restrictive housing section. Applewhite Aff. ¶ 9; Schankweiler Aff. ¶ 8.

After the staff secured Karrick in his cell, Applewhite ordered Karrick to step to the cell door, place his hands through the food passage window, allow his handcuffs to be removed, and then remove his clothes and hand them to Applewhite through the food passage window. Applewhite Aff. ¶ 10; Schankweiler Aff. ¶ 9; Rivers ¶ 8. Applewhite requested that Karrick

4

remove his clothes because all inmates sent to restrictive housing at Warren C.I. are to strip searched to ensure that the inmate is not concealing weapons or other contraband. Applewhite Aff. ¶¶ 10, 11. However, Karrick refused to comply with Applewhite's orders. Applewhite Aff. ¶ 10; Schankweiler Aff. ¶ 9; Rivers ¶ 8. Applewhite gave the orders a second time and, again, Karrick refused to comply.

Karrick then stated, "You better call mental health because I'm going to be in C.P. tonight." Schankweiler Aff. ¶ 9; Applewhite Aff. ¶ 10; Rivers Aff. ¶ 8. The officers understood C.P. to be a reference to Central Prison, the main hospital for adult inmates in the custody of the State of North Carolina. Schankweiler Aff. ¶ 9; Applewhite Aff. ¶ 10; Rivers Aff. ¶ 8. The Defendants interpreted this statement to mean that Karrick intended to injure himself. Schankweiler Aff. ¶ 9; Applewhite Aff. ¶ 11; Rivers Aff. ¶ 8.

Although Karrick was handcuffed, Applewhite knew that Karrick could still seriously harm himself by hitting his head on the concrete block walls, the steel bars, the steel bed, or other hard surface. Applewhite Aff. ¶ 11. In fact, Karrick had been hospitalized in the mental health unit at Central Prison just six weeks earlier when he intentionally injured himself by "head pounding." Schwartz Aff. ¶ 6. Applewhite also knew that it was possible that Karrick was concealing contraband that he could use to injure himself. Applewhite Aff. ¶ 11.

Applewhite directed Schankweiler, Rivers and Hunt to strip search Karrick. Schankweiler Aff. ¶ 9; Applewhite Aff. ¶ 11. Karrick was combative as the officers entered his cell. Hunt Aff. ¶ 5. Applewhite ordered Karrick to remove his boots twice, and both times Karrick refused. Applewhite Aff. ¶ 11; Rivers Aff. ¶ 9. Schankweiler then attempted to unlace Karrick's boots. Karrick drew his leg back in what officers perceived as an attempt to kick Schankweiler. Schankweiler Aff. ¶ 10; Applewhite Aff. ¶ 11; Hunt Aff. ¶ 5; Rivers Aff. ¶ 9.

5

Karrick claims that he did not intend to kick an officer, but that he was moving his feet to relieve pressure on his wrists from the officers lying on him. Compl. ¶ 15. Karrick also claims that officer Schankweiler punched him in his thigh 10–15 times after he moved his leg. *Id.* ¶ 16. Karrick straightened his legs and officers were able to remove his boots. *Id.* ¶ 17.

When confronted with a combative inmate, North Carolina correctional officers are trained to force the inmate against the nearest hard surface in order to minimize the inmate's ability to injure himself or others. Applewhite Aff. ¶ 11. Schankweiler took control of Karrick's legs and Schankweiler, Hunt, and Rivers attempted to gain control of Karrick by pinning him against the wall. Schankweiler Aff. ¶ 10; Applewhite Aff. ¶ 11; Rivers Aff. ¶ 9. However, Karrick continued to struggle and resist and stated, "fuck y'all I am going to sue your asses." Applewhite Aff. ¶ 11. Schankweiler then attempted to use a key to rip a hole in Karrick's shirt so that officers would be able to remove it. Compl. ¶ 19.

When Defendants could not pin Karrick against the wall, they forced him onto the metal bed in his cell. Schankweiler Aff. ¶ 10; Applewhite Aff. ¶ 11; Rivers Aff. ¶ 9. During the struggle with officers, Karrick struck his head on the bed. Rivers Aff. ¶ 9. Once on the bed, Karrick continued to move the top of his head against the metal bed, while shouting, "Ah, you motherfucker, ah you motherfucker!" Rivers Aff. ¶ 9. Karrick claims he lost consciousness after striking his head. Compl ¶ 20.

The Defendants were eventually able to gain control of Karrick and he calmed down. Applewhite Aff. ¶ 11. At that time, officers noted blood on Karrick's head and face. Rivers Aff. ¶ 10; Schankweiler Aff. ¶ 11. Schankweiler placed a clean towel on Karrick's head to stop the bleeding. Schankweiler Aff. ¶ 11; Applewhite Aff. ¶ 11; Rivers Aff. ¶ 10.

Immediately after the incident, Applewhite informed Lieutenant Wilson, as the officer-in-charge, and the medical staff, that there had been a use of force incident and that Karrick had a small cut on the top of his head. Applewhite Aff. ¶ 11. Karrick, who was sitting on the bed holding the towel to his head, was taken to the nursing station for examination and treatment. Applewhite Aff. ¶ 11. Officers did not observe Karrick lose consciousness. Applewhite Aff. ¶ 12; Schankweiler Aff. ¶ 11; Rivers Aff. ¶ 12.

At approximately 12:40 p.m., Lead Nurse Thomas S. Pearce arrived at Karrick's cell. Jones Aff. ¶ 8, D.E. 52–3. Nurse Pearce observed a five centimeter long laceration on the top of Karrick's head which had stopped bleeding. *Id.* However, Karrick still had blood on his forehead and scalp. *Id.* Nurse Pearce observed that Karrick was alert and oriented, but agitated. *Id.* Karrick was then transported to the Main Medical Unit ("MMU") at Warren C.I. for further evaluation and treatment. *Id.*

Once Karrick was in the MMU, Nurse Pearce cleaned and dressed the laceration on Karrick's head, which were estimated to be between 1/16 and 1/8 inch deep. *Id.* ¶ 9. Karrick complained of a severe headache, nausea, hot flashes, and dizziness. *Id.* There is no indication in the medical notes that Karrick complained of an injury to his thigh. *Id.* Medical staff determined that Karrick should be transported to the emergency room at Maria Parham Hospital in Henderson, North Carolina, for further evaluation, treatment, and a CT scan. *Id.*

Karrick presented to the Emergency Room with a laceration on his scalp 2 to 3 centimeters in length that showed no edema (swelling). *Id.* ¶ 10. Hospital staff classified the wound as superficial. *Id.* The laceration was irrigated with saline solution, explored, treated with betadine/wound cleaner and then closed with three staples. *Id.* There is no record of Karrick

7

complaining to the hospital staff that he suffered an injury to his thigh nor do the records indicate any observed injuries to his extremities. *Id.*

Karrick, however, did tell the hospital staff that he lost consciousness for approximately 30 seconds during the incident and while coming to the Hospital. *Id.* As a result, hospital staff ordered a CT scan for Karrick. *Id.* The scan of Karrick's cervical spine showed no anatomical irregularities were noted. *Id.* A second CT scan, this time of Karrick's head, showed no injuries. *Id.* Karrick was then released from the Hospital and transported back to Warren C.I. *Id.*

As provided in the aftercare instructions from the hospital, Karrick saw Nurse Hanks five days later to have his staples removed. *Id.* ¶¶ 11, 13. However, Karrick refused treatment. *Id.* ¶ 13. The following day, NCDPS medical staff removed two of Karrick's staples. *Id.* Approximately a week after the staples were removed, NCDPS medical staff examined Karrick's wound and noted that the "wound healed well." *Id.*

On May 16, 2014, Dr. Martin, a psychologist, evaluated Karrick. *Id.* ¶ 29. On that same date, a prison official completed an incident report about the incident on May 14, and Karrick showed the official a large black, blue, and purple bruise on his left thigh. Compl. ¶ 34.

On May 28, 2014, Karrick complained to the medical staff of "dizziness, headaches, migraines, and the large bruise on [his] leg." *Id.* ¶ 31. On May 28, 2014, Karrick wrote the psychologist about bad dreams where Sgt. Applewhite and Officer Rivers "would instigate me and try to laugh at me." *Id.* ¶ 33.

Karrick saw the psychiatrist again on June 9, 2014. During this appointment the doctor prescribed medication to address depression stemming from the use of force incident. Karrick subsequently requested and was granted a transfer to Pender Correctional Facility in Burgaw, North Carolina. *Id.* ¶ 43.

## III. Discussion

### A. Standard of Review

The parties have filed cross-motions for summary judgment. Summary judgment is appropriate when, after reviewing the record as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. *Celotex Corp.* v. *Catrett,* 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, *Anderson,* 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd.* v. *Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. *Anderson,* 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. *Scott* v. *Harris,* 550 U.S. 372, 378 (2007). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond* v. *PNGI Charles Town Gaming, L.L.C.,* 630 F.3d 351, 354 (4th Cir. 2011).

### B. Genuine Issue of Material Fact

As an initial matter, the court must determine whether there is a genuine issue of material fact which would preclude a grant of summary judgment to either party. Here, neither party argues that there is a genuine issue of fact that would require this matter to proceed to trial and

the court's independent inquiry has not discovered one. Although the record contains minor disputes over the events of May 14, 2014, there are no disputes that would impact the outcome of the case. Moreover, Karrick is limited in his ability to demonstrate the existence of an issue of fact because he has not submitted a verified complaint or affidavit that would allow him to contest the Defendants' affidavits. *See* Fed. R. Civ. P. 56(c)(1). Thus, the court will proceed to determine whether either party is entitled to judgment as a matter of law.

### C.  Eighth Amendment – Excessive Force

Karrick claims that the Defendants violated his Eighth Amendment rights by using force against him which resulted in a laceration on his head. He claims that the Defendants tackled him, punched his left thigh, choked him by yanking his T-shirt, and slammed him against the bed, knocking him unconscious, and resulting in a laceration to his scalp which required three staples to close. *See* Compl. ¶¶ 14, 16, 19, 20, 27. Defendants argue that the use of force against Karrick was not excessive, that the implementation of force was conducted in accordance with the policies of NCDPS, and that the force used was an appropriate amount of force to restrain Karrick in light of his resistance. *See* Defts' Mem. Supp. Mot. Summ. J. at 20, D.E. 51.

The Eighth Amendment to the Constitution, made applicable to the states through the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments . . .," U.S. Const. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain." *Whitley* v. *Albers,* 475 U.S. 312, 319 (1986). The Supreme Court has interpreted this language to prohibit correctional officers from using "excessive physical force against prisoners." *Farmer* v. *Brennan,* 511 U.S. 825, 832 (1994). A prison official violates this provision when he "maliciously and sadistically use[s] force to cause harm . . . ." *Hudson* v. *McMillian,* 503 U.S. 1, 9 (1992).

To establish an Eighth Amendment claim, an inmate must satisfy both an objective component–that the harm inflicted was sufficiently serious–and a subjective component–that the prison official acted with a sufficiently culpable state of mind. *Williams* v. *Benjamin,* 77 F.3d 756, 761 (4th Cir. 1996). Applying the foregoing factors to the present case, the record does not support Karrick's excessive force claim.

With respect to the subjective factor, a plaintiff must demonstrate that correctional officers used force "maliciously and sadistically to cause harm" instead of "in a good-faith effort to maintain or restore discipline." *Hudson* v. *McMillan*, 503 U.S. 1, 7 (1992). In assessing this factor, the court should consider "the need for the application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible official,' and 'any efforts made to temper the severity of a forceful response.'" *Id.* The Defendants have established that their use of force was not done maliciously or sadistically, but instead was necessitated by Karrick's threat to harm himself and his resistance to the Defendants' attempts to restrain him.

Here, the use of force occurred in the context of officers attempting to perform a strip search of an inmate who had just been placed in restrictive housing as a result of disruptive conduct. As discussed above, prison officials require inmates in restrictive housing to undergo a strip search to search for contraband in order to assure inmate and staff safety.

Although general policy requires the strip search to take place, Karrick's statements regarding his intent to harm himself heightened the needs to ensure that he did not possess any items that he could use to follow through on his threats. Moreover, officers were justified in being concerned that Karrick would harm himself because he had previously required medical care as due to a self-inflicted injury six weeks earlier. *See* Swartz Aff. ¶ 6, D.E. 52–7. In light of

11

Karrick's statements and prior actions, both earlier in the day and several weeks before, officers had reason to strip search Karrick to search for contraband and to use appropriate force to do so, if necessary.

Karrick challenges the Defendants' statement regarding his threat of self-harm by noting that there was no report to the psychologist that he intended to hurt himself and he was not placed on suicide watch. Pl.'s Mot. Summ. J. ¶ 8, D.E. 44. However, he has not denied that he made the statement that caused officers to be concerned that he intended to harm himself. The fact that officers may have ultimately determined, after the fact, that he did not intend to follow through on his statement has no bearing on the need to take such threats seriously at the time they are made. The court cannot countenance a rule that would allow correctional officials to disregard inmate claims of self-harm in the hopes that the inmate was merely posturing. This type of rule could lead to preventable injuries and deaths by inmates who are truly in need of attention.

After Applewhite ordered the officers into the cell, Karrick resisted their attempts to strip search him. His leg movements caused officers to believe that he was going to kick them. Officers responded by punching him in the leg repeatedly and forcing him up against the cell wall. When he continued to resist the officers, they forced him to the bed in his cell. These actions reflect an attempt to maintain order and discipline instead of a malicious or sadistic attempt to do harm.

Karrick claims that a statement Hunt made during his disciplinary hearing supports his assertions. Specifically, he points to Hunt's statement in an Investigating Officer's Report which relays that he "did not see Inmate Karrick kick anyone." Pl.'s Mot. Summ. J. ¶ 13; *see also* Docs. in Supp. Mot. Summ. J. at p 24, D.E. 44–1. But this point does not assist Karrick because no one

12

Case 5:15-ct-03054-BO   Document 59   Filed 02/03/17   Page 12 of 15

is alleging that he actually kicked an officer. Instead, as Hunt and the other officers stated, they believed Karrick "was trying to kick" Schankweiler. Hunt Aff. ¶ 5.

Moreover, there is no evidence that the use of force extended beyond that necessary to subdue Karrick, or that the use of force continued after Karrick was subdued. Although Karrick suffered a cut to his head during the altercation with officers, there is no evidence to establish that the injury was inflicted with malicious intent. *See* Jones Aff. ¶ 10. ("[H]ad [Karrick's] injury been caused by the corrections officers slamming his head into a metal bed, one would have expected to see some swelling in the area of the laceration.")

Karrick fares no better on the objective factor. Although the fact that an inmate suffers relatively minor injuries is no longer dispositive of the question of excessive force, "[t]he extent of injury may also provide some indication of the amount of force applied." *Wilkins*, 559 U.S. 34, 37. Although Karrick suffered a cut on his head, it was deemed to be superficial by medical providers. The laceration was irrigated with saline solution, explored, treated with betadine/wound cleaner and then closed with three staples, with directions for the staples to be removed five days later. *Id.* at ¶¶ 10–11. Karrick also claims to have suffered a bruise on his thigh. These injuries are consistent with the types of injuries that an inmate may sustain due to his resistance to officers and do not reflect an excessive use of force.

Karrick has failed to establish that the Defendants employed excessive force in violation his Eighth Amendment rights. Therefore, the undersigned recommends that the district court grant the Defendants' Motion for Summary Judgment and deny Karrick's Motion for Summary Judgment.

### D. Negligent Use of Force

Karrick's further assertion that the defendants were negligent in their use of force, *see* Pl.'s Mot. Summ. J. ¶ 14, does not warrant relief because mere negligence on the part of prison staff cannot establish a violation of the Eighth Amendment. *See, e.g., Albers,* 475 U.S. at 319 ("To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety."). This claim should be dismissed as well.

### IV. Conclusion

For the foregoing reasons, the undersigned recommends that the District Court deny Karrick's Motion for Summary Judgment (D.E. 44) and grant Defendants' Motion for Summary Judgment (D.E. 49).

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on plaintiff. Plaintiff shall have until 14 days after service of the Memorandum and Recommendation on plaintiff to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If plaintiff does not file written objections to the Memorandum and Recommendation by the foregoing deadline, plaintiff will be giving up the right to review of**

**the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, plaintiff's failure to file written objections by the foregoing deadline will bar plaintiff from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright* v. *Collins*, **766 F.2d 841, 846–47 (4th Cir. 1985).**

Dated: February 3, 2017

_____
Robert T. Numbers, II
United States Magistrate Judge